[Cite as *Gerkens v. Gerkens*, 2026-Ohio-1161.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Nicole Gerkens

Appellee

v.

Nicholas Gerkens

Appellant

Court of Appeals No.WD-25-056

Trial Court No. 2022DR0148

**DECISION AND JUDGMENT**

Decided: March 31, 2026

* * * * *

Maria Spasovske, for appellee.

Karin L. Coble, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant Nicholas Gerkens appeals the judgment of the Wood County Court of Common Pleas, Domestic Relations Division, which granted appellee Nicole Gerkens a divorce and divided the parties' assets. For the reasons that follow, the trial court's judgment is affirmed, in part, and reversed, in part.

## I. Factual Background and Procedural History

{¶ 2} The parties were married in 2004, and had two children together, only one of whom was still a minor at the time of the trial.  On December 16, 2022, Nicole filed a complaint for divorce.  Concurrently, she filed a motion for temporary orders, seeking temporary child support and spousal support.  On April 27, 2023, the magistrate entered a consent temporary order, which designated Nicole as the temporary residential parent and legal custodian of the children, and ordered Nicholas to deposit $570 per week into a joint bank account for the payment of household expenses.

{¶ 3} On June 23, 2023, Nicholas moved to modify the temporary orders, stating that he had been terminated from his employment.  On September 1, 2023, without having ruled on Nicholas's motion, the magistrate referred the case to mediation.

{¶ 4} On August 12, 2024, Nicole notified the court that mediation was unsuccessful, and she requested that the case be placed back on the docket for further proceedings.  Ultimately, the matter proceeded to a trial before a magistrate on November 18, 2024.

{¶ 5} Prior to the trial, the parties stipulated to several facts.  Notably, they agreed that they own farmland at 11338 Tank Farm Road in Cygnet, Wood County, Ohio.  Not included in the stipulation, but by way of background, the farm consists of land acquired through three different purchases.  In September 2010, the parties purchased approximately 60 acres from Ruth Hallett.  Nicholas's grandmother then sold him approximately 182.76 acres, which includes the marital residence, in January 2017.

2.

Finally, at some point not described in the record, the parties purchased an additional 10.5-acre parcel.

{¶ 6} In the stipulation, which was drafted by Nicole's attorney, the parties also agreed that the farm was appraised by Cory Hohman, who valued the 252.62 acres at $3,006,000 and the house at $242,000, for a total value of $3,248,000.

At the start of the hearing, the magistrate reaffirmed the validity of the stipulations:

> THE COURT:  I do have before me, before we get started with the hearing, stipulations that were filed with the Court on November 5th, 2024. That was filed by both counsel and signed by both counsel.
> [Nicholas's counsel], are these stipulations still agreeable to be adopted by the Court?
>
> [NICHOLAS'S COUNSEL]:  I haven't looked at them recently. Could I take a quick look?
>
> THE COURT:  Yes, absolutely.
>
> [NICHOLAS'S COUNSEL]:  I don't think I have any changes, but –
> Yes, I would just – those are exactly what was proposed.  I signed them there.
> Mr. Homan, the appraiser in this case, he appraised the property at the time that it was transferred from defendant's grandmother to him.  So that's not part of the stipulation but I don't think there would be any dispute.  Mr. Homan will be here to testify.  So I just bring that up.  I don't know if that's going to be a dispute or not.  But if it is, Mr. Homan can testify and the Court can evaluate his testimony.
>
> THE COURT:  Okay.
>
> [NICHOLAS'S COUNSEL]:  I don't know, [Nicole's Counsel], is that a problem or –
>
> THE COURT:  He did complete – this is a current appraisal – while the case was pending, is my understanding.

3.

[NICHOLAS'S COUNSEL]:  Oh, that's true.

THE COURT:  Okay.

[NICHOLAS'S COUNSEL]:  But a key issue, and I'll get to this in opening statement, is what it was worth at the time the – Nick's grandmother –

THE COURT:  The transfer –

[NICHOLAS'S COUNSEL]:  -- gave it to him.

THE COURT:  Correct.

[NICHOLAS'S COUNSEL]:  A huge issue in this case.  That's about the whole case.

THE COURT:  But the stipulation is agreeable?

[NICHOLAS'S COUNSEL]:  Yes, it is.

THE COURT:  Okay.  That's all I want –

[NICHOLAS'S COUNSEL]:  I just didn't want to waive what he had done earlier, Mr. Hohman.  He did it all at the same time.  He appraised it – basically he was hired at the end of last year and he did the appraisal – the current appraisal in the stipulation, and he also did the appraisal at the time of the gift.

THE COURT:  Okay.  I understand that.

[NICHOLAS'S COUNSEL]:  Okay.  All right.

THE COURT:  Is this stipulation contained in paragraph 6 regarding Mr. Hohman's appraisal agreeable still?

[NICHOLAS'S COUNSEL]:  Yes, it is.  And I think I've made my record, Your Honor, as to the earlier appraisal.

THE COURT:  [Nicole's Counsel], stipulations agreeable?

[NICOLE'S COUNSEL]:  Yes.

4.

THE COURT: All right. I will take those into consideration when writing my decision.

{¶ 7} Nicole then presented herself as her only witness. Relevant here, she testified that she was no longer living at the Tank Farm Road residence and that she did not want any of the land, only her share of the marital value of the property. She estimated her share of the marital value to be $1,154,000.

{¶ 8} She also testified that Nicholas made the $570 weekly deposits pursuant to the consent temporary order from March 9, 2023, through December 22, 2023. After December 22, 2023, Nicholas did not make any payments until the month of August 2024, when he started depositing $383.62.

{¶ 9} Finally, Nicole testified regarding an outstanding 2023 tax liability owed to the IRS. She stated that she filed jointly with Nicholas that year. She received a bill for $7,704.37, which she believed was half of the total taxes due. She requested that Nicholas be responsible for paying the entire 2023 outstanding tax liability.

{¶ 10} For his case, Nicholas called the appraiser Cory Hohman to testify. Hohman stated that when he did the appraisal, he did one with an effective date of December 13, 2023, and he did a retrospective with an effective date of February 6, 2017.

{¶ 11} In the 2017 appraisal, Hohman appraised 182.76 acres that were transferred from Nicholas's grandmother to Nicholas. The purchase price was $600,000, but Hohman testified that it was not an arm's-length transaction. He appraised the value of the property in 2017 to be $1,407,000, for an average value of $7,699 per acre.

5.

{¶ 12} In the 2023 appraisal, Hohman appraised 252.62 acres for a total value of $3,006,000, or approximately $11,899 per acre. In his testimony, he noted an error in his appraisal report. His report showed an "Opinion of Value" of $3,006,000. Hohman testified that this was the correct value. However, in the allocation of that value, he mistakenly again listed $3,006,000 as the value of the land, which was added together with the $242,000 value of the structural improvements, for a total overall value of $3,248,000. He explained that in the allocation, the land should have been valued at $2,764,000, for a total overall value of $3,006,000. He corrected his appraisal while on the witness stand and testified that the correction did not change his overall total, which was still $3,006,000.

{¶ 13} Nicholas then testified in his defense. He explained that his grandmother wanted him to continue to farm the land, so in early 2017, she sold it to him for $600,000.00. He considered the $807,000 difference between the appraised value and the sale price to be a gift from his grandmother to him. In addition, his grandmother's trust contained a provision that upon her death, the balance due from the $600,000 purchase price shall be reduced by 25 percent. To simplify things, Nicholas requested that 45.69 acres—or approximately 25 percent of the 2017 transfer—be awarded to him as separate property, which when multiplied by the 2023 appraised value per acre totaled $543,711.

{¶ 14} Nicholas also testified that beginning in April 2024 he has been unable to make all of the loan payments and tax payments on the farm. He stated that his mother began loaning him money to make those payments, and he presented a spreadsheet listing

6.

$40,380.06 owed to his mother. He requested that the payments made by his mother be treated as marital debt.

{¶ 15} Nicholas summarized that he believed the total amount of marital equity to be divided was $2,107,126, with each party receiving half, or $1,053,563. He proposed that Nicole receive three parcels of land totaling 70.54 acres, and that he pay her an additional $208,000. He testified that he has a buyer that is willing to pay $720,000 for 60 of the 70.54 acres.

{¶ 16} He further testified that if he was forced to pay Nicole her share in cash, he would have to sell the family farm, which would generate capital gains tax. He estimated that he would be required to sell three-fourths of the farm to pay Nicole her share of the marital equity.

{¶ 17} Finally, regarding the weekly payments for living expenses, Nicholas testified that he began making the payments on December 12, 2022, and he has paid a total of $32,537.35 through October 21, 2024. He also testified concerning the 2023 tax liability. Nicholas believed that the taxes have been paid, but if they have not, he acknowledged that he would be responsible for half. He did not introduce into evidence a full and complete tax return for that year.

{¶ 18} Nicholas then called Eric Whipple, a certified public accountant. Whipple estimated that if the property was sold, the capital gains tax would amount to $500,000. He separated his estimate into three groupings of land. The main grouping, which was the land purchased from Nicholas's grandmother and which contained the marital residence, would generate capital gains tax of $348,488. The second grouping contained

7.

the 10.5-acre parcel, and it would generate $18,726 in capital gains tax. Finally, the third grouping of land consisted of the 60 acres purchased from Ruth Hallett, and it would generate $121,405 in capital gains taxes. Whipple acknowledged that the presence of the residence on the property could result in a partial tax exemption that would alter the estimated capital gains tax calculation, but he believed that the exemption would only apply to the parcel that contained the residence.

{¶ 19} Jeffrey Casey testified next. He testified that he is ready and willing to purchase 60-acres of farmland for a total price of $720,000, which he would pay in cash. He described that the 60 acres consisted of one 40-acre parcel and one 20-acre parcel. Although not made clear through the testimony, a comparison of Casey's signed purchase agreement, the purchase agreement between Nicholas and his grandmother, and the two appraisal reports reveals that the 40-acre parcel was part of the sale from Nicholas's grandmother, while the 20-acre parcel was part of the sale from Ruth Hallett.

{¶ 20} Nicholas's mother, Valerie Whipple—no relation to Eric Whipple—also testified. She testified that she made rent payments, property tax payments, income tax payments, as well as other payments for her son totaling $40,380. She stated that she made the payments expecting to be repaid. She did not, however, have any signed contracts or agreements with either her son or Nicole.

{¶ 21} Finally, Jim Hammer testified as the lawyer who prepared the documents for the sale of the property from Nicholas's grandmother to Nicholas. He also prepared Casey's purchase agreement.

8.

{¶ 22} Following the hearing, the magistrate entered her decision on January 27, 2025. The magistrate found that a distributive award was not appropriate, and that an equal division of the marital property was equitable.

{¶ 23} Relevant here, in dividing the assets, the magistrate found that the value of the Tank Farm Road property was $3,248,000. Of that, $543,711 was Nicholas's separate property from his grandmother's gift. In addition, there was a total of $477,804 owed in loans on the property, but the magistrate found that the approximately $40,000 "loan" from Nicholas's mother was not "a debt to be allocated in this matter." Subtracting the gift and indebtedness from the property's value, she concluded that the marital equity in the property was $2,226,485, or $1,113,242.50 per party. To divide the property, Nicholas was ordered to pay Nicole $613,242.50 within 180 days of the judgment entry, and thereafter to pay her $100,000 per year for five years beginning on June 1, 2026.

{¶ 24} In addition to dividing the real property, the magistrate found that Nicholas had a deficiency of $25,371.04 from failing to make the weekly $570 living expenses payments pursuant to the temporary orders. In particular, she found that the total amount due for the year 2024 was $29,640, but Nicholas only paid $4,268.96. She noted, however, that Nicole was only requesting $5,119.14 for the deficiency, and that is what the magistrate ultimately awarded. The magistrate further ordered Nicholas to pay child support of $453.77 per month, plus $23.73 per month for cash medical support, effective January 1, 2024.

9.

{¶ 25} Lastly, the magistrate ordered that Nicholas shall be solely liable for any liabilities arising from the parties' 2023 income tax filings.

{¶ 26} Nicholas timely filed objections to the magistrate's decision and supplemental objections. Later, after the transcript from the hearing was prepared and Nicholas retained new counsel, he consolidated his previous filings into eight objections, the first five of which are relevant here. First, he argued that the magistrate erred in valuing the real property using the stipulated amount of $3,248.000, instead of Hohman's corrected amount of $3,006,000. Second, he argued that the magistrate erred in failing to subtract the capital gains tax from the value of the real estate. Third, he asserted the magistrate erred in finding that the $40,000 owed to his mother was not marital debt. Fourth, he contested the magistrate's failure to rule on his motion to modify the temporary orders, which he argued resulted in the $5,119.14 deficiency. Finally, he maintained that the magistrate erred in assessing the entire 2023 tax liability to him.

{¶ 27} On July 31, 2025, the trial court entered its judgment overruling Nicholas's objections. Addressing them in order, the trial court first found that the stipulated amount of $3,248,000 removed the necessity of proving the value and was binding on the parties, and the appraiser reaffirmed the total value of the land was $3,006,000, which did not alter the stipulation of $3,006,000 for the land and $242,000 for the residence. Next, the trial court found that the evidence regarding the capital gains tax was speculative and need not be considered. It then found that the $40,380 provided by Nicholas's mother should not be treated as genuine indebtedness "[b]ased on the lack of corroborating documentation, absence of repayment terms, failure to enforce payment, and the familiar

10.

(sic) relationship." Turning to his fourth objection, the trial court found that the magistrate did not err in failing to rule on Nicholas's motion to modify the temporary orders, and those orders remained in effect thereby properly resulting in the award of $5,119.14 for the deficiency. Finally, the trial court found that Nicholas had satisfied the 2023 tax liability either with an $8,000 credit from a previous year's tax filing, or through payments from his mother, and therefore he was not entitled to a credit because he did not use his own separate funds.

## II. Assignments of Error

{¶ 28} Nicholas timely appeals the trial court's July 31, 2025 judgment, asserting five assignments of error for review:

> 1. The trial court abused its discretion by accepting the stipulated valuation of the marital residence instead of the correct amount to which the appraiser actually testified.
>
> 2. The trial court abused its discretion by failing to either subtract the capital gains from the value of the real estate or allocate the capital gains tax between the parties.
>
> 3. The trial court committed plain error by ordering child support to run starting January 1, 2024, when Nicholas was paying Nicole support directly due to temporary orders.
>
> 4. The trial court erred in finding the debt to Nicholas' mother was non-marital debt.
>
> 5. The trial court erred in assessing 100% of the 2023 tax liability to Nicholas.

## III. Analysis

{¶ 29} Nicholas's first, second, fourth, and fifth assignments of error pertain to the trial court's division of marital property. R.C. 3105.171(B) provides that, "[i]n divorce

11.

proceedings, the court shall . . . determine what constitutes marital property and what constitutes separate property. . . . [U]pon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section." Marital property shall be divided equally, unless an equal division of marital property would be inequitable. R.C. 3105.171(C)(1).

{¶ 30} The trial court's division of marital property is reviewed for an abuse of discretion. *C.D. v. T.D.*, 2025-Ohio-4976, ¶ 22 (6th Dist.), citing *Turner v. Turner*, 2024-Ohio-2200, ¶ 60 (6th Dist.). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 31} Here, the trial court determined that an equal division of property would be equitable. Neither party challenges that determination. Nicholas, instead, argues four ways in which the division of property was not equal.

### A. Real Estate Valuation

{¶ 32} In his first assignment of error, Nicholas argues that the trial court abused its discretion when it valued the parties' real estate at $3,248,000. "[T]he 'valuation of marital assets is typically a factual issue that is left to the discretion of the trial court.'" *Hall v. Bricker*, 2024-Ohio-1339, ¶ 26 (10th Dist.), quoting *Roberts v. Roberts*, 2008-Ohio-6121, ¶ 18 (10th Dist.). "A trial court's assignment of an asset's value must be based upon competent, credible evidence." *Id*, quoting *Warren v. Warren*, 2009-Ohio-6567, ¶ 15 (10th Dist.). "That is to say, '[a] trial court must have a rational evidentiary

12.

basis for assigning value to marital property.'" *Id.*, quoting *Fernando v. Fernando*, 2017-Ohio-9323, ¶ 26 (10th Dist.).

{¶ 33} In this case, the parties stipulated that the total value of the real estate was $3,248,000. "It is well-settled that '[s]tipulations of fact bind the parties and, ordinarily, the court to the facts to which stipulations have been entered. The court is thus relieved of inquiry as to evidence which may exist to prove these facts.'" *Heaton v. Heaton*, 2010-Ohio-6214, ¶ 67 (6th Dist.), quoting *Toth v. Toth*, 2005-Ohio-7001, ¶ 17 (6th Dist.). Through the stipulation, the trial court therefore had a rational evidentiary basis for valuing the marital property at $3,248,000.

{¶ 34} Nicholas nonetheless argues that the stipulated value was based on a mistake in a portion of Hohman's appraisal report, and he contends the true appraised value is $3,006,000, which Hohman testified was always his conclusion. Nicholas is correct that Hohman appraised the total value of the property, including the residence, at $3,006,000. That valuation is listed in the cover letter to the appraisal report, the "Summary of Facts and Conclusions" at the beginning of the appraisal report, the "Reconciliation and Opinion of Value" section following the sales comparison approach on page 20 of the appraisal report, and in the conclusion right above the appraiser's signature on the last page of the report.

{¶ 35} Nicole does not view Hohman's testimony in the same way. Rather, she asserts that Hohman's testimony corroborates the stipulated $3,248,000 valuation. But this view is not supported by the record.

13.

{¶ 36} At the hearing, Hohman testified that the value of the improvements to the land was $242,000. He then explained his mistake:

> So if you notice there below my value it says 3 million – 3,006,000.
>
> . . .
>
> So the land on the bottom section where it says allocation of value to the left, and then I have land, I have it 3,000,006 – 3,006,000, that should have been 2,764,000. Okay. And then when you add the 2,764,000 to the 242,000, and you go down to that bottom line, that should have equaled $3,006,000.
>
> . . .
>
> Does that make sense? The error was that I accidentally put in the overall value in that top line and then it automatically . . ..

Hohman was then asked if the correction changed his overall total, and he replied, "No. The total is still 3,000,006 (sic)."

{¶ 37} In overruling Nicholas's objections to the magistrate's decision, the trial court similarly mistook Hohman's testimony. The trial court stated,

> Although the appraiser testified as to an error regarding the placement of certain calculations, and Exhibit F was admitted with his annotations, he reaffirmed the total value of the land was $3,006,000.00. . . . The parties' stipulations remain unaltered and provide that the value of the parties' 252.62 acres is $3,006,000.00, the value of their residence is $242,000.00, for a total value of $3,248,000.00.

(Citation to the transcript omitted.). Hohman did not, however, reaffirm that the total value of just the land was $3,006,000. Instead, he directly testified that the value of the land should have been $2,764,000, and the overall total value of the property—including the land and improvements—was $3,006,000. Hohman's appraisal report and his testimony was therefore not consistent with the stipulated value of $3,248,000.

14.

Nicholas argues that the difference between the appraised value and the stipulated value is significant. Nicole did not want real estate and the trial court ordered that her share of the marital property be paid in cash, which resulted in Nicholas having to pay her an additional $121,000 that does not exist in the value of the property. He asserts that the parties intended to stipulate to the value of the appraisal, and a mutual mistake occurred in that stipulation. He maintains that the trial court therefore abused its discretion when it ordered the parties to equally divide the martial estate but did not correct the mistaken value of the property, resulting in an unequal division of assets.

{¶ 38} In *Toth v. Toth*, 2005-Ohio-7001 (6th Dist.), this court reviewed the trial court's division of the marital value of the husband's retirement accounts. In that case, the magistrate listed an incorrect date for the marriage of the parties in the decision. The husband argued that the incorrect date improperly added an extra year to the marital value of his retirement plans. *Id.* at ¶ 14. The parties, however, had stipulated to the marital values on the record in open court. Further, the wife argued that the erroneous date of marriage was merely a typographical error of no significance. *Id.* at ¶ 15, 18. On appeal, this court, recognizing that stipulations of fact bind the parties, affirmed. Notably, this court found it significant that the magistrate did not use the marriage date to compute the retirement fund marital values. *Id.* at ¶ 17.

{¶ 39} Unlike the present case, the decision in *Toth* gives no indication that the husband produced evidence that the stipulated marital values were incorrect. Here, in contrast, Nicholas presented the appraisal report and Hohman's testimony showing that

the overall value of the property was $3,006,000. Nicole did not cross-examine Hohman or present any evidence to the contrary.

{¶ 40} This case is more similar to *Goode v. Goode*, 89 Ohio App.3d 405 (10th Dist.1993), cited by Nicholas. In that case, the parties stipulated that the wife's income was $6,600 for purposes of calculating child support. *Id.* at 409. But her income tax forms showed that her income was between $12,000 and $13,000. *Id.* at 410. The husband moved for Civ.R. 60(B) relief from the judgment, which the trial court denied. On appeal, the Tenth District found that the trial court abused its discretion and reversed. It reasoned that although a question of fact existed whether the wife intentionally misled the husband, if found that her statement of income was a mutual mistake, which would satisfy the avenue of relief under Civ.R. 60(B)(1) for judgments based on "mistake, inadvertence, surprise or excusable neglect." *Id.* at 411.

{¶ 41} The Tenth District further considered the trial court's reasoning that the husband had a duty to conduct at least minimal discovery as to the wife's income and his Civ.R. 60(B) motion must be denied so that his failure to do so would not be rewarded. *Id.* The Tenth District found that this constituted an abuse of discretion "since it is reasonable for a party to rely upon the adverse party's representations as to the adverse party's income, and the party is not required to test the truthfulness of the adverse party's representation. Under the circumstances, [the wife] had a duty accurately to disclose her income and to testify accurately as to her income." *Id.*

{¶ 42} Here, similar considerations apply. There is no question that the parties intended to stipulate to the appraisal amount. Indeed, shortly before Hohman's

16.

testimony, Nicole's counsel stated on the record, "I'm not disputing the appraisal amount." Unfortunately, Nicole's drafting of the stipulated amount was a mistake—the record contains no indication that it was done so intentionally—and did not accurately reflect the overall value of the marital property as determined in the appraisal report. While it can be fairly said that Nicholas should have recognized the error before entering into and affirming the stipulation and should have expressly sought to withdraw the stipulation following Hohman's testimony, it must also be noted that Nicole did not object to Hohman's testimony, cross-examine him, or object to the admission of the appraisal report that he corrected on the witness stand. The result is that both parties contributed to the error.

{¶ 43} When Nicholas raised this error, the trial court incorrectly found that the parties' stipulation was unaltered by Hohman's testimony. The trial court's finding in that regard was unreasonable. Furthermore, the trial court's finding requires Nicholas to bear solely the cost of that error in the amount of $121,000, thereby frustrating its own determination that an equal division of marital property would be equitable. The trial court, therefore, abused its discretion when it found that the value of the marital property was $3,248,000.

{¶ 44} Accordingly, Nicholas's first assignment of error is well-taken.

### B. Capital Gains Tax

{¶ 45} In his second assignment of error, Nicholas argues that the trial court abused its discretion when it did not allocate the capital gains tax between the parties.

17.

{¶ 46} R.C. 3105.171(F)(6) provides that "[i]n making a division of marital property . . . the court shall consider all of the following factors: . . . (6) The tax consequences of the property division upon the respective awards to be made to each spouse." This court has recognized that if an award "is such that, in effect, it forces a party to dispose of an asset to meet obligations imposed by the court, the tax consequences of that transaction should be considered." *Bauman v. Bauman*, 2002-Ohio-2172, ¶ 16 (6th Dist.), quoting *Day v. Day*, 40 Ohio App.3d 155, 159 (10th Dist.1988). But a trial court should not speculate as to potential tax consequences. *Id.*, citing *James v. James*, 101 Ohio App.3d 668, 688 (2d Dist.1995). "[W]here an appellant has failed to produce evidence of tax consequences in the trial court, or where nothing in the record suggests that an asset must be liquidated, tax consequences are speculative and need not be considered." *Id.*, citing *Guidubaldi v. Guidubaldi*, 64 Ohio App.3d 361, 367-368 (11th Dist.1990).

{¶ 47} Nicholas argues that the capital gains tax in this case is not speculative. He states that he will be required to sell a portion of the property to pay Nicole her share. To that end, he elicited testimony that Casey was willing to purchase 60 acres for $720,000 and introduced a copy of the yet-to-be-executed purchase agreement into evidence. Nicholas further argues that he presented evidence of the amount of the capital gains tax through Whipple's testimony. Whipple testified that the sale of a 60-acre parcel would incur a capital gains tax of $121,405.

{¶ 48} Nicole, on the other hand, argues that any capital gains tax would be speculative. She contends that there is sufficient liquidity in the property such that a sale

18.

is not required or inevitable. In addition, she notes that the trial court did not order Nicholas to pay the entire $1,113,242.50 award in one lump sum but rather ordered him to pay approximately $600,000 within 180 days, followed by five annual payments of $100,000, which would lessen his need to sell the property. Finally, she argues that Whipple's testimony was equivocal and uncertain. Specifically, she asserts that he was unable to provide a "clear, reliable calculation, especially in light of the possible $500,000 exclusion for a principal residence and the unclear application to mixed-use property."

{¶ 49} Relevant here, the magistrate found,

> Defendant called Eric Whipple, a CPA, to testify as to the tax consequences of the capital gains of $348,488 on the real estate due to the difference in the value of the property at $1,407,000 and the amount paid in the sum of $600,000, see Exhibit GG; on cross-examination, Mr. Whipple was unable to determine if the $500,000 capital gain exclusion would apply in this matter due to a variety of factors which include the issue of the marital residence not being on a separate parcel. Therefore, the court is unable to determine the exact capital gains issue in this matter without clear expert testimony.

{¶ 50} In his objections to the magistrate's decision, Nicholas argued that the capital gains tax was not speculative. He pointed to Casey's testimony that an agreement existed to purchase 59 acres for $720,000 and asserted that "the two parcels which Casey would purchase will have a capital gains tax of $18,726 + $121,405 for a total of $140,131."

{¶ 51} In overruling the objections, the trial court reasoned,

> The magistrate's decision provides that Eric Whipple, CPA ("Whipple") testified regarding the capital gains tax associated with the real property. On cross-examination, Whipple was unable to determine whether

19.

the $500,000.00 capital gains exclusion applied because the marital residence is not on a separate parcel. The magistrate indicated that without clear expert testimony, she could not determine the exact capital gains amount. Finding of Fact No. 39. Accordingly, the magistrate did not subtract the capital gains tax when determining each party's equity in the real estate. *See* Finding of Fact No. 47.

. . .

Defendant's claim that he will incur a capital gains tax of $140,131.00 when he sells two parcels of land to his neighbor, Mr. Casey, is based upon the testimony of Whipple. Whipple testified regarding two parcels of land which total approximately 70 acres. Transcript 212:19-22. However, Mr. Casey testified about purchasing roughly 60 acres. Transcript 222:2 – 223:5. It is also unclear from the evidence as to whether the $500,000.00 capital gains exclusion would apply because the marital residence is not on a separate parcel. Whipple testified that farmland "would most likely not" qualify for the exclusion and that he could argue that farmland is not part of the principal residence. Transcript 215:17 – 217:15. Upon review, the evidence regarding the capital gains tax is speculative and the magistrate properly refrained from considering it.

{¶ 52} Upon review, this court agrees that the capital gains tax is speculative, but not entirely for the reasons stated by the trial court. Relevant here is the discrepancy noted by the trial court between (1) Nicholas's argument that he will sell to Casey the two groups of land totaling 70 acres analyzed by Whipple, and (2) Casey's testimony that he would purchase only 60 acres. It is unclear why Nicholas would argue to the trial court that he would sell both the second and third groups of land listed in Whipple's analysis—a claim which he does not make on appeal and which is not supported by the record—but it illustrates the difficulties arising from Nicholas's failure to describe the properties with precision.

{¶ 53} The entire property consists of several parcels totaling approximately 250 acres. Whipple testified that the total amount of capital gains tax that would be incurred

20.

if all the property was sold was $488,619. From this total, he broke down the estimated capital gains tax incurred between the three different groups of land.

{¶ 54} The first consists of approximately 178 acres that was purchased from Nicholas's grandmother and which contains the marital residence. It had a tax basis of $600,000 and a current appraised value of $2,115,166.[1] That section accounted for the $348,488 capital gains tax referenced by the magistrate, and Whipple testified that the tax liability for that grouping may be impacted by the $500,000 principal residence exclusion, but "you could argue that that part would not be part of the principal residence, the part that's being farmed." The second group of land was a 10.5-acre parcel that had a basis of $44,000 and an appraised value of $125,415. It would generate an estimated $18,726 in capital gains tax. The third group consisted of 60 acres purchased from Ruth Hallett. It had a basis of $178,000 and an appraised value of $705,849. It would generate an estimated $121,405 in capital gains tax. Whipple testified that the second and third groups "would most likely not" be subject to the $500,000.00 principal residence exclusion because they are entirely farmland.

{¶ 55} Nicholas argues that the estimated capital gains tax is not speculative and can be determined to be $121,405. But this argument presumes that Casey is purchasing the 60 acres that were obtained from Ruth Hallett that Whipple analyzed as the third group of land. The record reveals otherwise. Instead, Casey proposed to purchase only a 20-acre parcel that was acquired from Ruth Hallett. The remaining 40 acres consisted of

---

[1] The $1,407,000.00 value found by the magistrate was the appraised value of the property as of February 6, 2017.

21.

a parcel that was acquired from Nicholas's grandmother.  Because the properties were purchased by Nicholas at different times, in different transactions, and for different amounts, they each would have their own separate basis, and consequently the amount of capital gains would be different.  Importantly, Whipple was not asked to analyze this proposed transaction.

{¶ 56} Even assuming, therefore, that Nicholas would be required to sell farmland to pay Nicole her share of the marital property, and that Casey's purchase agreement is sufficient evidence of that sale, the record contains no evidence as to the capital gains tax consequence of that proposed transaction.  *See Huelskamp v. Huelskamp*, 2009-Ohio-6864, ¶ 38 (3d Dist.) (tax consequences are "purely speculative" where "[e]ven if the sale of an asset may be required, [husband] has failed to specify what, if any, tax consequences might result"); *James v. James*, 101 Ohio App.3d 668, 688 (2d Dist.1995) (no abuse of discretion in failing to consider tax consequences where husband "asserted that he was likely to incur $12,000 in capital gains taxes, but he failed to present any evidence of the basis for determining the amount of capital gain that he would realize as a result of a sale").

{¶ 57} Accordingly, any present accounting for capital gains tax would be speculative.  The trial court, therefore, did not abuse its discretion when it did not consider the capital gains tax when dividing the marital property.

{¶ 58} Nicholas's second assignment of error is not well-taken.

22.

### C. Debt to Nicholas's Mother

{¶ 59} In his fourth assignment of error, Nicholas argues that the trial court abused its discretion when it failed to find that the $40,380.06 paid by Nicholas's mother was a marital debt.

{¶ 60} "Marital debt has been defined as any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose." *Keckler v. Keckler*, 2012-Ohio-3990, ¶ 7 (6th Dist.). Here, the issue is not whether the debt is marital or separate, but whether it is debt at all.

{¶ 61} In that regard, the magistrate found that the "loan" to Nicholas's mother was "not a debt to be allocated in this matter." On review of Nicholas's objections to the magistrate's decision, the trial court considered "the lack of corroborating documentation, absence of repayment terms, failure to enforce payment, and the familiar (sic) relationship," and determined that the magistrate "did not err in refusing to treat the funds as genuine indebtedness or in declining to require either party to repay the sum."

{¶ 62} Nicholas maintains that the payments were a loan from his mother. He points to his and his mother's testimony, which both described the payments as a loan for which she expected to be repaid. The record also contains invoices and images of electronic and canceled checks showing payments made by Nicholas's mother. The payments are for Nicholas's and Nicole's income taxes, school district taxes, property taxes, and farm loan obligations. Notably, Nicole did not present any evidence, and makes no argument on appeal, that Nicholas's mother did not make those payments or that those payments were not for marital expenses.

23.

{¶ 63} Nicole argues instead that the payments should not be considered a loan. She cites the absence of any promissory notes, repayment schedules, interest rates, or attempts to collect on the "loan." She states that the trial court's skepticism of the debt was appropriate and necessary "to prevent the marital estate from being diluted by questionable obligations."

{¶ 64} Nicole relies on *Hancock v. Hancock*, 2002-Ohio-7106, ¶ 21-23 (6th Dist.), in which this court upheld the trial court's determination that a $28,000.00 transfer from the husband's father was a gift, not marital debt. In that case, the husband's father transferred the money "in the past." *Id*. at ¶ 22. The father provided no details of a repayment plan, there was no record of the balance owed or any payments made, nothing was in writing, no payments had been made for the past two or three years, and the father did not know how the parties spent the money. *Id.* The trial court declined to order either party to repay the sum, finding that "there was no documentary evidence of an agreement to repay the money or that any part of the amount had been repaid," and "there was no evidence that [husband's] parents had taken any steps to enforce repayment." *Id.* at ¶ 23. On appeal, this court held that the trial court's finding was reasonable and not an abuse of discretion. *Id.*

{¶ 65} Here, in contrast, Nicholas's mother made payments during the pendency of the divorce proceedings to "keep everybody out of trouble with the authorities." There is no dispute that she made those payments directly to the creditors, and there is no dispute that the payments were for marital obligations. Nicholas's mother further testified that she expected to be repaid when her son sold some crops.

24.

{¶ 66} In this way, the case is more similar to *Leady v. Leady*, 2001 WL 1002061, *6 (6th Dist. Aug. 31, 2001), in which this court upheld the trial court's finding that the husband's mother loaned the parties $12,000 to pay marital debts.  The husband and his mother both testified that she loaned him the money, and the husband testified as to what debts the loan was used to pay.  *Id.*  The wife did not dispute that the money was used to pay the debts.  *Id.*  This court found that in light of this record, the trial court did not err.  *Id.*  Furthermore, this court noted that "the loan left the parties in essentially the same financial position as before but basically amounted to a consolidation of several debts.  [The parties] owed a total of $12,000 before the loan and owed the same afterward.  [The wife] has failed to show how she was prejudiced by the trial court's finding that the loan from [the husband's] mother was a marital debt."  *Id.*

{¶ 67} Like *Leady*, the money from Nicholas's mother was used to pay marital debts, and her payment left the parties in the same financial position, just owing the money to a different creditor.  Because the trial court determined that the marital property should be divided equally, it is unreasonable to award Nicole a $20,000 windfall by not accounting for the marital debt paid by Nicholas's mother.  To do so would give credence to the absurd proposition that Nicholas's mother gave Nicole what amounts to a $20,000 gift while she was in the process of divorcing Nicholas.  The trial court's failure to consider as a marital debt the $40,000 paid by Nicholas's mother is an abuse of discretion.

{¶ 68} Accordingly, Nicholas's fourth assignment of error is well-taken.

25.

**D. 2023 Tax Liability**

{¶ 69} In his fifth assignment of error, Nicholas argues that the trial court abused its discretion when it allocated the 2023 tax liability solely to him. Importantly, Nicholas's mother paid the 2023 tax liability. He recognizes, therefore, that the division of the 2023 tax obligation can be accomplished by recognizing that the payments made by his mother are a valid marital debt. Accordingly, because this court determines that the debt to Nicholas's mother must be accounted for in the property division as described in his fourth assignment of error, his fifth assignment of error is moot.

**E. Child Support Payments**

{¶ 70} Finally, in his third assignment of error, Nicholas challenges the trial court's order to pay child support effective January 1, 2024.

{¶ 71} At the outset, he acknowledges that he did not file an objection to this order in the trial court and can therefore only argue plain error. Civ.R. 53(D)(3)(b)(iv); *Kelley v. Kelley*, 2020-Ohio-6778, ¶ 18-19 (6th Dist.). "In order for a court to find plain error in a civil case, an appellant must establish (1) a deviation from a legal rule, (2) that the error was obvious, and (3) that the error affected the basic fairness, integrity, or public reputation of the judicial process and therefore challenged the legitimacy of the underlying judicial process." *Kelley* at ¶ 19, quoting *State v. Morgan*, 2017-Ohio-7565, ¶ 41. "In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997).

26.

{¶ 72} Nicholas argues that it was plain error for the trial court to order him to pay child support commencing on January 1, 2024, when he was already under temporary orders to pay $570 weekly for household expenses. He explains that although he failed to make most of the temporary order payments beginning in January 2024, that fact was accounted for in the trial court's order that he pay $5,119.14 for the deficiency. He thus maintains that he has been ordered to pay support twice. Nicole responds that the temporary orders for household expenses and the child support orders are two different obligations, and therefore there is no double recovery.

{¶ 73} Upon review, it is not necessary to resolve Nicholas's argument that double payment of child support would constitute plain error because the record is not clear that double payment was ordered.

{¶ 74} Civ.R. 75(N)(1) provides that during the pendency of divorce proceedings, the magistrate "may grant a temporary order regarding spousal support to either of the parties for the party's sustenance and expenses during the suit and may make a temporary order regarding the support, maintenance, and allocation of parental rights and responsibilities for the care of children of the marriage." Here, the consent temporary order was that "[Nicholas] shall deposit into the parties' joint bank account the sum of $570 per week and [Nicole] shall pay the household expenses." It thus appears that the order is for temporary spousal support, which is a "payment or payments to be made to a spouse or former spouse . . . that is both for sustenance and for support of the spouse or former spouse," R.C. 3105.18(A), and not for child support. It is also noteworthy that the temporary order does not include a child support calculation worksheet as required by

R.C. 3119.022(A), which states that the standard worksheet "shall be used in all courts and child support enforcement agencies when calculating child support and cash medical support obligations." In any event, because of this ambiguity, the record does not demonstrate an obvious error warranting application of the plain error doctrine.

{¶ 75} Accordingly, Nicholas's third assignment of error is not well-taken.

### IV. Conclusion

{¶ 76} For the foregoing reasons, the judgment of the Wood County Court of Common Pleas, Domestic Relations Division, is affirmed, in part, and reversed, in part. The trial court's findings that (1) the total value of the marital real estate is $3,248,000, and (2) the $40,038 owed to Nicholas's mother is not a marital debt, are reversed. The matter is remanded to the trial court for further proceedings consistent with this decision. Pursuant to App.R. 24, the parties are ordered to share the costs of this appeal evenly.

Judgment affirmed in part and reversed in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Thomas J. Osowik, P.J. | |
| | JUDGE |
| Christine E. Mayle, J. | |
| | JUDGE |
| Charles E. Sulek, J. | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

**MAYLE, J., concurring, in part, and dissenting, in part.**

{¶ 77} I agree with the majority's analysis and resolution of the first, second, and third assignments of error. I would, however, find the fourth and fifth assignments of error not well taken because both assignments of error hinge upon witness credibility, which is left to the sound discretion of the trial court.

{¶ 78} Regarding the fourth assignment of error, the trial court concluded that Nicholas's mother's payments was not marital debt "[b]ased on the lack of corroborating documentation, absence of repayment terms, failure to enforce payment, and the familiar relationship." Unlike the majority, I am unwilling to find that this conclusion is "unreasonable" and "absurd" just because payments were made during the course of the divorce proceedings. Thus, I would find the fourth assignment of error not well taken.

{¶ 79} Regarding the fifth assignment of error, the trial court found that Nicholas provided inconsistent testimony regarding the payment of the parties' 2023 tax liability—testifying that the parties had a credit that resolved their 2023 taxes, but later testifying that their 2023 tax liability was paid by his mother. The trial court found that either way, "there is no indication that Defendant used his own funds to pay the debt and is therefore not entitled to receive a credit for making such payments." Because this determination depends upon the finding that Nicholas's mother's payments are not marital debt that must be repaid—which, again, hinges upon witness credibility determinations—I would find the fifth assignment of error not well taken.

29.